We do have a motion before us, a motion to supplement the record that we should address before we start. You know, this case involves an extraordinarily voluminous record, and just yesterday, the day before oral argument, we received a motion to further supplement that extraordinarily voluminous record. We have conferred as a panel, and I think I speak for the panel when I say that it's really wholly inappropriate to get a motion to supplement the record the day before oral argument, and it's entirely unacceptable. We have conferred unanimously. We will deny the motion. Okay. We can proceed. Mr. Critchley. Good morning, Your Honor. Michael Critchley on behalf of the appellant, John Prisk, and I will be meaningfully brief in terms of material I have referred to. Your Honor, I'm going to address the issue of our positions at the court below, earned as a matter of law, and failing to instruct the jury on recklessness and negligence, gross negligence, and as a constitutional right, present an effective defense. We start with the negligence, gross negligence divide at the get-go, Mr. Critchley. You would agree, would you not, that that's at a minimum, it's plain error review, right? Because you asked for the instruction, and so your best hope is to not be knocked out immediately by the invited error doctrine. Yes, Your Honor. If I could just, my position and my argument, that issue on the plain error will be handled by Mr. Pettacini. I'm talking about failure to charge recklessness and negligence as it pertains to the non-Clean Water Act counts. Okay. And our position is that it was an error as a matter of law, and when we want to address that issue, I say we just go to basically two pages of the transcript. The charge conference on March 28th and March 29th. May I ask you, Mr. Critchley? Sure. You were urging those charges because you were going to defend that the conduct was reckless or negligent? Yes. Not that it was willful. Is that correct? That's correct. That's the big line, Judge. Our position was, the unique thing about this case is that the charging document created a situation where negligence could be a basis for a crime, and negligence could be the basis for a defense. But, of course, you could argue that to the jury. I mean, if you wanted the judge to tell the jury that these were your defenses. Yes, we could have done that. And that they could not be convicted if they found recklessness. But had they, I could get to the transcript and explain to you why that theoretically could have been done, but we were precluded from doing that. If I could just give you just a brief moment. We look at what took place on the charge conference on March 28th, the first day. The issue of recklessness. The government took the position that our charge submitted to the court, according to Mr. Goldsmith on page 37 of the brief, the proposed instruction that the defendants have for recklessness seems fine. Later on, he says the same thing, it's fine. The court that day says, I'm definitely going to charge recklessness. The next day, the court comes in and does a reversal. And when you look at the reasons why the court gave for the reversal, here you have the prejudice that prevented us from having a meaningful defense. We go to the March 29th transcript on the joint appendix 5768. When we finally realized that recklessness is not going to be charged, this is what the court says in explaining the 180. Recklessness is a heightened form of negligence. When she said that, that was a matter of law that was an error. Well, that's not, can't the transcript be read to understand the district court judge's ruling to be that if I insert instruction about another level of mens rea here, one that isn't in play, I will be inviting confusion for the jury, and I don't want to have the jury confused, so I'm not going to start talking about a level of mens rea that isn't in the case. But respectfully, it is in the case, and I'll tell you why. August 18th, before we even pick the jury, August 18th of 05, I said to the court, in discussing the potential mens rea issue, in the eyes of a trial litigator, we are going to have a mens rea train wreck. And what did I mean by that? Well, hold up. Stick with me here for a second. Sure. I know you folks disagree with the judge's ruling to instruct on the Clean Water Act as ordinary negligence, and you've told me somebody else is going to deal with that. Right. So let's set that aside. Right. Assuming that the judge was correct on that for the purpose of discussion, there are Clean Water Act violations as lesser-included offenses at the negligence level only. Right. And then there are knowing violations. Correct. So how is it that recklessness is in the case at all if those are the two things? I asked the court to be mindful of two opinions, Farmer v. Brennan, which discusses the difference between civil negligence, civil recklessness, and criminal recklessness, and I asked the court to consider Justice Alito's opinion last year in Global Tech where they drew a dichotomy between knowing and willful blindness as opposed to recklessness and gross negligence. Our position is, and the court referred to the threshold, we have a threshold. She gave us on this side of the threshold was innocence. And what did she give us on this side? She said the defense could be civil negligence. If the jury found that your conduct did not exceed the standard of conduct of an ordinary prudent person. So let me make sure I get you. You're not disagreeing that if we accepted her ruling that this was under the Clean Water Act negligence. Your assertion isn't that recklessness was properly in the case somewhere. Your assertion is we're worried the jury would be confused if you didn't instruct on recklessness. Is that the point? No, that's completely opposite. Our position is that when you look at the sliding scale of mental states, you have negligence, civil negligence, you have gross negligence, and you have recklessness. That side of the balance sheet would be non-culpable blameworthy conduct. The only time it becomes culpable blameworthy conduct is when you cross that threshold and you get to knowing and willful. Our position is. I know you've got me lost. I don't know whether you're fighting my hypothetical or what. You guys asked for a negligence instruction. You asked for the lesser included offense. You got it. Now, I'm just asking you to assume for the sake of discussion that that ruling is correct and that what the district court was looking at on the playing field was I got some counts that might be found on the basis of ordinary negligence. Everything else has got to be knowing. Would that be an accurate statement for the district court to have, assuming she was right about the ordinary versus gross negligence, is that an accurate view for the district court to have taken of the counts that were in play? No. What was charged that had associated with it a reckless mens rea that could have been the basis of conviction? All of the felony counts because our position was that we may have engaged in conduct that constituted reckless conduct, that we were aware of our conduct and our conduct was unjustifiable and it caused a substantial risk that people would do something they shouldn't have done. So is your argument that she held the jury to too high a standard of proof? She should have let them find your clients guilty on a lower standard of proof? Absolutely not. I'm saying that she didn't give us a balanced charge because we were entitled to. I know you're shaking. Let me finish. You just got me lost. I don't understand. I don't understand. If it's the case that there's negligence and there's knowing and there's no count as to which a guilty verdict could properly have been returned on a reckless basis, I guess I should ask you that. Is that in fact the case? That's the case. Then why are we talking about recklessness because the judge said I don't want to confuse the jury about recklessness? Because our position is that when you talk about the sliding scales of mental states, recklessness is a component that the jury could consider as non-culpable conduct. So what you're arguing is they'd be confused if you didn't disabuse them of the notion that recklessness could be in the case. Isn't that your argument? No. I'm saying that the jury was not given an opportunity to effectively consider our defense. Our defense could not be cabined into just simple negligence. Do I understand, Mr. Critchley, that there are various offenses under the Clean Water Act and as to some, you ask for a simple negligence charge. That's exactly the misdemeanor charge. As to others, the mens rea was knowingly. And it's only as to those, the knowing charges, that you ask for the recklessness. That's correct. And we're saying when you get to those charges where knowing and willful is the component which the mens rea is based upon, anything south of that, my word, south of that, and we're saying recklessness is a state of mind that the jury should be given an opportunity to consider. Our defense should not have been cabined on those counts into just simple negligence. Right. And what you wanted the judge to say, what you wanted the judge to say was if they were reckless, that's not knowing and you can't find them guilty. That's exactly right. Right. So since the judge repeatedly said, in fact, at one point, an example, I repeat, a defendant cannot be convicted of conspiracy based on a state of mind that does not rise to the level of knowing and willful participation in the conspiracy. If the judge is saying to the jury repeatedly, except for on those negligence counts, you cannot find them guilty unless you find it knowing and willful. Why is it error for the judge to say, and I'm not going to start talking about reckless because that's not in the case? Because that's why we cited Keeble v. United States, Your Honor. We're saying in this unique case, in this unique case where negligence is the basis for a conviction and negligence is charged as a defense, that the jury could be confused, that if they felt the only option for the defense was simple negligence, then they opt, as in Keeble said in the Supreme Court, that they'll opt for a felony conviction. And in the process, in opting for the felony conviction, they were not given the opportunity to consider something else which was reckless. Right. Thank you, Judge. Mr. Critchley, thank you very much. Mr. O'Reilly, Mr. Critchley, I don't know if you took – yes. Okay. Mr. O'Reilly. Good morning, Your Honor. John O'Reilly, representing Atlantic States. May it please the Court. With regard to this particular case, because the government failed to provide full, and comply with the rules pre-trial, the corporation was denied a fair trial. But in addition to that, its employees, for whom we are responsible, the other five defendants were denied a fair trial. In our particular case, had we known about this pre-trial, we would have been – Are you arguing on behalf of the institution, the plant, or – I am, but there will be some parts judged with regard to the individuals, because the individuals, the five individuals behind the company, the five defendants behind the company, we have to defend them, absent them being rogue employees. But had we had this information ahead of time, we would have investigated it. I think the record reflects when they surprised us. Given the amount of paper, which is vast, on the Rule 16, Giglio, and Brady issues here, and the limited amount of time, give us, will you, just several of what you consider the most egregious examples of violations in that area. Judge, if I could just use one particular aid with regard to that. As long as it's not 100 pages, yes. It's not 100 pages. I picked the short one, Judge. This was Robert Rush, key witness for the prosecution. This top part was what we got in jinx. I mean, what we got pre-trial, I'm sorry, five pages, fully redacted. If you put them all together and they make one page. Fifty-four pages come in jinx incorrectly, Judge. We should have had a pre-trial. This is under Rule 16? Yes, this is Rule 16. Are you not only permitted to discover the statements that the prosecution is going to use in the trial? Judge, Rule 16C provides, Section C. Organizational defendants, but that gets you back to A&B.  In those situations, when you're going to have conduct that's going to bind the company, we're entitled to it. We should have had them all. But wait a second. A specifically says if the government intends to use a statement at trial. But C doesn't provide for that, Judge. It provides if an organizational defendant, we get it all. It says any statement described in Rule 16A&B. That's correct, Judge. And B, we get the statements whether you're going to use the witness at trial or you're not going to use the witness. Written statements. Right. We never got any of this, Judge. We got no written. When you're talking about it, there were statements made by these individuals. The grand jury is a copy of a written statement. We never got that for a total number of employees. When did you eventually get it? Well, yeah. Let's separate the word never from when you did. Excuse me. Excuse me. Let's separate the word never, which was your word a little bit ago, from those situations where you received something but received something late. Judge, if we can separate those, we received some things in janks, some things we never received. All right. And some items, for instance, rough notes, we never received. Throughout the entire trial, we never received those. With regard to 29 employees that get qualified that are binding the company, we never got the opportunity to investigate it. And when we did, when you say we're binding the company, your argument is pinned on an interpretation of 16A1C2, right? Correct. Which is that it's the Chalmers argument, which is if you're saying that the behavior of the employee can bind the company, then everything that that particular employee says, whether it has anything to do with the case or not, we get. That's correct. Okay. Now, I want to explore that with you a little bit. First off, you're aware that the Southern District of New York itself appears to, I mean, at least another judge in that district, has abandoned that position and said, that can't be right, right? I mean, Judge Chin's decision, the Chalmers decision is the one you're relying on, but there's later authority from that court that rejects that position, doesn't it? Judge, I believe that that's the correct position. I believe it's the position that ought to be adopted by this court. Whenever you have an organizational defendant, because without it, how can we ever defend ourselves? We're bound by what they do. Let's talk about that. The government's position wasn't that you don't get the statements associated with the behavior that supposedly binds. They assert, and I think I understood you guys to accept this, that they were giving you that. What was bothering you was you're reading, and it is Chalmers' reading as well, that we get every statement made by those defendants, not only statements associated with the behavior which allegedly binds Atlantic. Is that correct? That's correct, Judge. We did it on at least three or four occasions during the course of the discovery pretrial, asking for it over and over again, including Ocean and Jake. Here's the point of theirs that I'd like you to respond to. They assert that if that view of 16A1C2 is taken, that organizational defendants will get vastly better rights than individuals, that that means no individual defendant could say as to other witnesses in the case, give me everything you've got. They would have to wait for janks. 16A1C2 is meant to recognize the duality of employees in an organization, and as to behavior which they could bind the company to, you've got to give them, but as to other statements, no. What's wrong with their rationale that you'd be giving organizational defendants a windfall to take the Chalmers view? Judge, the thing that's wrong with that is that assertion is incorrect. There were a total of 34 employees that testified. Twenty-nine we say bind the company. The five defendants and 24 others, and we listed all of them. For five individuals that were employees, we abided by exactly what you're talking about, Judge. We got their janks material, and we cross-examined them. But for the rest, we're entitled to it because it's a constantly moving target as to what we're going to defend against, and we were surprised. And the prejudice was huge. James Huebner was huge. When you say the prejudice was huge, with Mr. Rush, I think you just showed us the paper on it, right? Right. You cross-examined him. They say you cross-examined him for like six days, correct? Eight days, Judge. Eight days? Eight days, and, Judge, if I had the actual testimony of what Mr. Rush said he did, I might still be cross-examining him today. Frankly, Judge. And I believe that. And, Judge, the problem with it is, and here's the problem, because the perception, exactly what you said, Judge, and I'm glad you did, Judge Smith, the perception as a trial lawyer from a jury is these guys don't know what they're doing. And I think the eight days of cross-examination, which was basically working long nights, up to 4 o'clock in the morning trying to interview witnesses, tripping him up, searching over records. Had we had that 30 days before trial, we'd have killed him because we'd have proved that he wasn't there on Friday nights. We'd have proved the same thing we did on December 4th and 5th. He wasn't even working. We could have proved, disproved, almost everything he said. We could have done the same thing with Bebendis and Schultz if we had one photograph, if we knew that ahead of time. They knew that the whole plant had been destroyed to change to a dry bag house. The scrubber sludge where that water went to was no longer there. There is no drain back there. There hadn't been a drain back there. They used a map from 1995. There hadn't been one at the time. But that's the prejudice that you're talking about, Judge. Had we had it ahead of time, we could have investigated it and we would have destroyed these witnesses. Okay, Mr. O'Reilly. Thank you. Thank you very much. Mr. Brunel. Ms. Brunel. Very sorry. Your Honors, my name is Hillary Brunel. With the law firm Nuzzy Mason, I represent Craig Davidson. Mr. Davidson was a supervisor at Atlantic States, and he was acquitted of all the Clean Air Act and OSHA violations. His clean water convictions were based on the testimony of, and I might, I should say to the Court, I'm going to address the mutually exclusive verdicts. Based on Russia's testimony, the only witness who said that Craig Davidson had anything to do with the nightly discharges, the jury in this case found that Mr. Davidson was guilty of both negligent discharges and conspiracy. Are you the one, Ms. Brunel, who's going to speak to the issue? No, I started talking with Mr. Kristolian. Okay, I'm sorry. No, no, that was Mr. Pettacini. Okay, go ahead. Okay. As the government said pre-trial in one of its submissions, the crime of conspiracy to commit a negligent act simply does not exist. Under these circumstances, this Court in gross said that it would be patently unfair to leave standing two convictions when one of them is for a crime the defendant cannot have committed. I believe that the difference- At least there are separate counts of the indictment, right? A conspiracy count and a negligence count. Yes. I believe that the district court and the government confuse this case with the Powell scenario. Powell dealt with an acquittal and a guilty verdict, and under those circumstances the Court said that those verdicts would not be reviewable for inconsistency because the acquittal might not be based on a specific jury finding relating to men's- But you are, of course, aware that a jury can reach inconsistent verdicts. Exactly, and that's what- Can reach inconsistent verdicts because perhaps the jury wanted to give one of the parties a break. That's right. That's what Powell says, but that's not Mr. Davidson's situation. Mr. Davidson's situation- Well, Powell specifically says it's the acquittal that bars the review for inconsistency because of the leniency and the compromise, but that's not Mr. Davidson's situation. He had two guilty verdicts, and one was based on a very specific finding of negligence, and that barred the conduct under conspiracy. That's the exception in Powell that this Court embraced in Gross. The government's fallback is that even if the negligence verdict knocks out Objective A of the conspiracy, which related to the discharges, there's still Objective D of the conspiracy, which related to the false statement, and also about a discharge, but there was only one conspiracy in this case with interrelated parts, and there's no way at this point to just simply say that A can be removed from the case now that the trial is over. How D would have fared by itself without any other objectives, any other conspiracy objectives, is simply unknown because there were inferences about conspiratorial conduct that arose from those other objectives. And I just want to add, Your Honors, that the other issue here is that Objective D, I believe, can't be retried because of the jurisdictional issue. Again, Objective D was based on the false statement. Can I ask you a question? Sure. I think the government is saying that the jury could properly have decided that the government couldn't prove a knowing violation of the CWA with respect to Mr. Prisk or Mr. Davidson on any one specific occasion, that is, with respect to the ones charged in the indictment, but they nevertheless could have said that there was a knowing and willful agreement to violate it. So what's wrong with that argument, the logic of that argument? Well, first of all, it's purely speculative. We can't know whether or not that's what the jury thought. But that's the whole point of Powell, isn't it? No. No, I disagree, Your Honor. The whole point of Powell is that an acquittal is not a specific finding, a specific either fact finding or mens rea finding. In this case, what we're left is we know that in all of those 16 counts under clean water, the jury said negligence every single time. That's a specific jury finding that the government can't just undo with speculation about what the jury's intent might have been. Powell talks about acquittals, it does, but these were findings of lesser included offenses, right? Yes. So are you saying that the reasoning of Powell is not sufficient to cover a circumstance where a jury says, I'm not finding you, defendant, guilty of the charged offense, I think it's a lesser included, and that that could be consistent with Powell's reasoning that maybe you've got something going on there that, even if not fully consistent, can be rationalized and is therefore permitted under the law? In this particular case, this is why that footnote in Powell and this court's acceptance of that footnote is so important. When you have a specific jury finding, that's the record, that's the finding. It would be patently unfair to sort of definalize those jury verdicts with speculation about what they meant. What this reviewing court is left with is a specific finding of negligence. And in fact, like I said, the government said that the crime of conspiracy to commit a negligent act doesn't exist. It said it right there in their pretrial submission, and the court actually included that concept in her... Were there more violations going on? I'm sorry, were there more violations going on than the two specific discharges, the substantive discharge counts?  I believe it was from December 1998 through February of 2000. So as a factual matter, what's factually inconsistent about a jury saying, on those days where it's substantively charged, I believe it's a major burden of proof? Overall, given the evidence as a whole, talking about conspiracy, I think there was a knowing and willful violation. Because the jury said... That's not what the jury said. The jury said no. There was no overall intentional finding. The jury said negligence. And again, we're speculating. And the thing that's so problematic with this case is that, first of all, the whole juxtaposition of the negligence and intentional finding on conspiracy I think is going to lead right into what Mr. Pettacini is going to say about the confusion about mens rea. The other problem with this case is that you really... Despite what the government might say about Mr. Chase and Mr. Owens, the only person who ever says the name Craig Davidson, and for that matter that says that supervisors specifically ordered any discharges, is Robert Rush. So you have a jury making... Well, speaking of Mr. Pettacini, he happens to be next. Okay. May I just make one final point? Yeah, finish up. Yes. I just wanted to say, with respect to Objective D and the possibility of retrying the conspiracy, I just want to add because the government never introduced any evidence, like it did under the Clean Air Act, about that essential element of jurisdiction, under the Clean Air Act they actually called a witness who testified about a joint federal-state program. There was no witness about this, and I just want to caution the Court that the face of the permits say nothing about a joint state-federal program. So it's introduced into the case solely by nature of the judge's charge. Thank you very much. Thank you, John. Mr. Pettacini? Thank you. Good morning. Michael Pettacini on behalf of Jeffrey Mowrey. Your Honor? You're the fellow I've been waiting for. It looks like I'm the point man today. You want to go to that specific issue that I've been trying to get at with some of your colleagues, the issue of the... Invited error, Judge? Yeah, right, and my question to you is, do you concede that even if it's not invited error, we're under a plain error review standard? That's correct, Your Honor. Okay, and if it's plain error review, I guess what I want you to respond to is the argument that if there are only two circuit decisions out there and they both go against you, how can it be plain error for the District Court to have instructed on ordinary negligence? At the time this case was being tried, the only decision out there was the Hanasek decision that was directly on point in this case. That being the status of the law, we couldn't legitimately argue to the judge that she should give a greater instruction as it related to the Clean Water Act. The statute basically held in Hanasek that negligently violating the statute had a higher men's rate than criminally violating the statute. That was the status of the law at the time. Since that, and Judge Cooper pointed out in her memorandum opinion at page 27, footnote 17, which I think is docket entry 721, that following the verdict in this case in 2007, Safeco v. Burr was decided by the Supreme Court, which basically rejected the idea that you can't... Even if you accepted your characterization of what Safeco unequivocally means, if the ruling made at the time is made on the basis of the only authority extant, how can it be plain error to have done what she did? Because I think, Your Honor, you're given the option of considering whether or not it was plain error based upon the change in the law that has result... has enunciated in Safeco. And that is... I'm referring to the United States v. Indian Transport, which is a similar situation. The court was permitted to consider it. What's your authority for the proposition? I mean, I understand the authority for the proposition that a later change in the law might get you out from under the invited error doctrine, but what's your authority for the position that plain error review is done on the basis of later developing law? Well, I think if you analyze the later developing law and you look at it in the context of what the model penal code was back... which talked about gross negligence in the context of the Clean Water Act... So it should have been plain to her then? I believe so, Judge. That and also what was... Tough position to take since you guys are the ones who asked for the instruction, isn't it? Well, Your Honor, given the circumstance we were in at the time, we couldn't legitimately push for that. But she... the court herself has recognized in her opinion that this might be up for reconsideration given the decision in Safeco. And what's interesting, during the period of time we were trying this case, the Third Circuit model jury charges were being constructed. They weren't complete yet. In the Third Circuit model jury charges, it called for a gross negligence standard in a finding under the Clean Water Act. So in a matter of fairness, I think the argument would be it was plain error in reviewing what occurred here in the record. It certainly affected a substantial right to all the defendants, particularly my client who was convicted of five intentional water counts and an object of the conspiracy involving the Clean Water Act. And I think... Apart from the model jury charges and case law, what is the independent justification for imposing a more stringent requirement than the one that's contained in the statute? The statute says negligently. The issue is how should you define it. It seems to me... I know, but it's just one word. You want gross before negligence. Yes, Judge. It seems to me in the context of the criminal case, it just seems illogical that you impose a lesser standard than in the civil case. The civil case talks about gross negligence when you're applying it in the civil context. Is it not a judgment call for Congress to make? Well, what I think Burr says, or Safeco says, is that it's perfectly... It's not proper to just consider the one standard and then say it doesn't apply to the other standard. That included a willful versus an intentional or grossly... an intentional conduct interpreting the statute. It didn't have to do with the Clean Water Act. It dealt with the Fair Credit Reporting Act. But the decision in that case directly implicates what happened here. So our position is, it's right for consideration by this Court as plain error because we submitted it clearly was error, and of course the rights of our clients were substantially prejudiced. Good. Mr. Pettacini, thank you very much. Thank you, Judge. Mr. Sullivan. May it please the Court. Michael Sullivan on behalf of Scott Fobert. Mr. Fobert was the Human Resources Director at the plant, and I would like to have the Court look at the Cox accident, which is sort of the central theme against Mr. Fobert, and I'm going to make a sufficiency of the evidence argument. I've been doing this for 20 years. I don't think I've ever done that at the appellate court level. I am well aware of the degree to which at this level you're not retrying the case and you don't have the boots on the ground and you didn't sit through the trial, but I ask the Court respectfully to remember that this is still the venue of last resort for an individual who was not in fact proven guilty because there was not sufficiency of the evidence. And I hope to grab the Court's interest by going first to a quote from the government's brief, the government's brief in which the government was trying to boil down why there was sufficient evidence against Mr. Fobert about having participated in some kind of a cover-up. The government says in its brief at page 224, quote, Fobert's extensive involvement in the activities of the scene of the accident made it highly unlikely that he was unaware of the scheme to repair the brakes. And I suggest that that's as good as the government can do and that's not enough. And if I can, in my short time, just freeze-frame a couple of moments on that day for the Court. Tragically, Mr. Cox is killed by a forklift. Mr. Shepard, one of the employees, testified that there was then a meeting that was convened, that Mr. Fobert came, Mr. Fobert was on the scene, Mr. Fobert left to make a phone call for the ambulance, there was an investigation by the police department, Mr. Shepard then testified that Mr. Shepard was in some kind of a meeting, a discussion, in which Mr. Shepard was told, essentially, take the forklift, take it down to maintenance, and have them fix it. I'm paraphrasing, but essentially that. But critically, there was no testimony from Mr. Shepard or anyone else that placed Mr. Fobert at that meeting within earshot of that meeting or being told about that meeting later. The next step in the progression was that Mr. Shepard said, essentially, that Mr. Shepard accompanied the forklift going to the maintenance area, that Mr. Shepard tested the brake with his hand, that it wasn't working. And no one testified that Mr. Fobert was involved in that, that he was present, that Mr. Shepard ever told Mr. Fobert that Mr. Shepard had tested the brake. The next, and I have only two more steps in this process, the next step was that Mr. Fobert was told by the OSHA inspector to arrange to have the forklift brought back up to the area where they were doing the investigation. Mr. Fobert did arrange for that, and then Mr. Fobert was asked, has anyone touched the... Has anyone, I'm paraphrasing, manipulated... He said, has anyone touched the lift. Did anyone touch the lift? Essentially, the question was, has anyone fixed it or done anything with it? And he said no. Mr. Fobert said no. The government says, well, the technical correct answer to that should have been, I don't know, leading to some inference that the jury could draw the conclusion that Mr. Fobert was lying about that. Remember, the facts at this point in the timeline, there are no facts, as I have just discussed or would suggest, that Mr. Fobert was involved in any of what the government says were corrupt discussions. So when he said to her, if he said to her, and the testimony is that he said to her, no, no one has manipulated it, touched it, played with it, or whatever the jury could draw from that, there's no reason, there's no evidence in the record to suggest that he had any corrupt knowledge that it had been played with. You have to finish up, Mr. Sullivan. I'm sorry? You have to finish up. I will finish up. And then the last step in the process was he was asked to test the machine, which he did. So I suggest to the court, and I understand that it's very unusual for the court to get involved at this stage in that matter, but I really ask the court to look very hard at the facts with regard to whether Mr. Fobert, as opposed to anyone else, was involved. Thank you. Thank you, Mr. Sullivan. Mr. Morimarco? May it please the court, Glenn Morimarco, on behalf of the government, I would just like to introduce at council table, I also have Andrew Goldsmith and John Schmelzer from the Department of Justice who gave a lot of assistance on this very big lift of this brief. So I was actually going to go in order, and I'm happy to go wherever the court wants, but I'm going to surprise you and say I actually thought the strongest issue they've raised so far is Mr. Sullivan's issue on the sufficiency. Well, I happen to agree with you. So rather than go in order, why don't you start with that? Because there's nothing really that directly ties Mr. Fobert here. Yeah, I mean, this one was a little bit thin. Let me set the setting a little bit, too, though. I would point your honors to the very thorough and meticulous opinion that Judge Cooper did on pretty much almost every issue in this case, except for the discovery issues, which they didn't raise. But she spent over 100 pages talking about sufficiency point by point by point, so you'll be able to see she focused in on this count and each individual in it. The point that I would emphasize the most, and just so you know, this not only was not perfunctory in terms of length, but she actually did throw out three counts when she was doing her sufficiency review. But she said on the remainder, the evidence was strong. She did one of the things that I did in my brief as well, or I guess I took from her. She really looked at the full body of evidence against Mr. Fobert and looked at what his role was in the whole panoply of the scheme, and that helped her come to the conclusion. Point us to specific facts which augment what we've just heard from Mr. Sullivan, which he says is insufficient. Yeah, I mean, the one fact that I think is an absolute. You might respond to his assertion, too, that the government has essentially conceded it's insufficient by saying it's highly unlikely, as if that were the standard of proof. Let me point first to the piece of evidence that I think is most crucial here. The misdirection here was all about the forklift, obviously, and the fixing of the forklift in between the time of the accident and the time the inspector came a few hours later. Mr. Fobert was the one that the conspirators chose to take Tiedemann around and show her all this. So you can have some inferences from that, but the key is really the questioning that went on. Tiedemann is there. She's an inspector from OSHA, and she's trying to get to the bottom of this accident, and she asks him what is absolutely a crucial question in this case. She says, was that forklift tampered with? No, I'm sorry. Did anyone touch that forklift? Now, if he legitimately did not know, although it was coming from maintenance, which is a place that you would think maybe maintenance was working on it, he had an absolute obligation to say at that time. I don't know. To say, I don't know, rather than mislead that person and say, no, that was a representation. Wait, wait, wait. What's wrong with I don't know? Oh, I don't know would have been fine, because then she would have had reason to go and find out more about whether or not it had, in fact, this was a representation by the. How about ordinary? Do people in ordinary parlance say no when what they're saying is, to the best of my knowledge, no? Well, even that would have given her an indication that she needed to look further. I mean, this is a crime scene. You know, how much of an offender do we make this man for a word? He says no. Well. Criminal. When you look at it in the scope of all the other things. There you go. So go there. What's the scope of all the other things? Oh, okay. Well, I mean, he lied to OSHA about numerous other instances, and Judge Cooper was better, obviously, at pointing all these out. I don't have. Well, that may be helpful in terms of evaluating his credibility, but you have the burden for sufficiency purposes. I mean, what else is there in the evidence, contextually or otherwise, that would allow us to use this no rather than I don't know response as a basis for finding some sufficiency here in his role with respect to the foreclosure? Well, what you see through the other accounts is that he's the one who's running human resources, and he's the one who the OSHA compliance people come to pretty much whenever there's a problem. And he, you know, I'm sorry, I don't have total recall right now of the individual instances in which he was otherwise caught lying to the OSHA inspectors about accidents that did or didn't happen. But I do think that Judge Cooper did summarize those in her opinion. But I say it was inferential. I think there's a lot to the affirmative representation at a crime scene. You know, if it were a police officer and someone asked, you know, about a crucial fact in the case and you legitimately didn't know what had happened, I don't think you would make an affirmative representation. But your whole point, in fact, something the government rests pretty heavily on in this case is that this wasn't the crime scene. In fact, in the context of the discovery dispute, if I'm not mistaken, the government's been hitting the table pretty hard saying these OSHA investigators are not criminal investigators, and that's why you didn't get certain things associated with them. So is the government trying to have it both ways, saying, oh, you know, for purposes of criminal liability, you should have treated this like you were being faced with a criminal investigation and speaking to a criminal investigator. But when it comes to your obligations for discovery, that's just regulatory OSHA stuff. Don't worry about that. I mean, how can you get that both ways, Mr. Malcolm? No, I see your point, Judge Jordan, and I'm not going to push that one. It was a bad analogy. There were police officers there that day investigating, obviously, because a death had occurred. But to the extent that someone from OSHA was coming around, she certainly wasn't functioning as a law enforcement individual there. How did this play out at trial? In other words, you presented it. Ms. Tiedemann testified, I assume, and she was questioned about the statement that Mr. Sullivan's client made. Right. And she said he said no. He said no. But he testified, didn't he? Yes, he did. He did testify. And I'm trying to remember. What was his testimony in this regard? Did he say, I did not say no? I said, I don't know? Yeah. Judge Fuentes, would it be okay if I consult with Mr. Goldsmith? No. I don't know what the record reflects on that, Judge Fuentes. Let me ask you. Well, it's kind of important because well, then it's just a question of credibility, actually, right? Yeah. I mean, it's my belief that he, in fact, denied it. The problem is that that comes on the defense case. Were there notes, extemporaneous notes, with the conversation she had with him? All of Tiedemann's notes were disclosed to the defense as part of the thing. I don't know that she kept verbatim notes of the question and answers. My suspicion is that she did not. But, again, this was a crucial question that she needed to know about. I mean, the whole point of this. I took the position that rough notes don't have to be given, and I'm wondering what your justification of that is in light of the specific language of 16A1 about all statements. Can you enlighten us on that? Well, I mean, 16A1B says any relevant written or recorded statement by the defendant. What do you look at in the rule that says the government's got the authority to say, well, those written notes of the conversation don't count. You get what we decide to type up and give you. What do you rely on in the rule? Well, Your Honor, as some of the district courts have held that have looked at this, the word any can have different meanings. That if the statement is otherwise codified in a final report, and that final report is accurate, then, in fact, they have received the statement that they're entitled to. Isn't the ordinary meaning of the word any, any? Well, there's any and there's all. I mean, they are summarized. I mean, let me just say, this is a little bit difficult, but there's a uniform practice in the District of New Jersey. There's a uniform practice in the Eastern District of Pennsylvania that agent rough notes, and this arose out of the Vela and Amar cases from this court, and the uniform practice is that we preserve all rough notes as we were ordered to do, and we give them to the district court judge to review to see if they're inconsistent upon request of defendants. That's an interesting practice, but I guess I'm trying to find out what your, other than that's the way we do it, what's your position on the law for why you're entitled to take that position? Well, Your Honor, the position is that if it is, in fact, the problem with rough notes of agents are that they potentially contain and frequently do contain a lot of work product. So you ask for an in-camera review of them? Well, we do. We provide them to the district court, but rather than redact them, what we do is we provide them in a report form, which makes them final. You provide them in report form? Well, there's a 302. There's a 302 where there's a final report. So you provide the 302, not the rough notes? Yes, and we provide the rough notes to a district court judge, and the district court judge reviews them to see if they're consistent. So the position is, if I've got you correct, is producing the written report is the equivalent of and, in fact, better than if we'd made a Xerox copy and taken a magic marker to it to redact the work product. We give you this typed version, and if you have some basis for saying we're entitled to see the work product piece of it, you can go to the court. Is that the pitch? Yes, Your Honor. Okay. Why was the change in Mr. Rush's testimony not immediately divulged to the appellants? They complained vociferously that you knew about it. It did come up mid-trial, but you knew about it and you sat on it. What's the government's position on that? First, are they right as a matter of fact? May I add to that question, if the government knew, when did the government know or find out about the change in the testimony? Your Honor, this occurred during preparation of Mr. Rush for trial testimony, so it would have been, although the record doesn't precisely reflect it, would have been within a few days of when his testimony went forward. The government's position is that the better practice is to turn that over immediately, that technically under the rule it does not count as a statement of the witness or the defendant that we intend to introduce at trial because that statement applies to, for example, when you're going to have an officer or anyone, a law enforcement person typically testify themselves about the actual statement. This was a witness who was going to give the sum and substance of the same testimony at trial, but it doesn't technically fall within the rule, although it's our practice now to turn those over immediately. It sounds like what you're saying is the government is, the later in the game it gets, the less you have to give notice, which seems a little upside down, doesn't it? Well, it is slightly a little bit thin, and frankly it's not what the Justice Department today is urging prosecutors to do when these things develop mid-trial. You know, these things do happen. We're talking about an eight-month trial, and we're talking about a delay of a couple of days. They say they were severely prejudiced by the failure to turn this material over. What's your response to that? Absolutely not, Your Honor. In fact, they can't show any prejudice at all, because what's absolutely clear is we could not have turned this over pretrial because we didn't have it. So the timing of three days before when they received it and when they received it, again, Robert Rush was on the witness stand. They cross-examined him for eight days. They went to town on this, and they did exactly what they would have done if they'd had it three days earlier. But in fairness to that cross-examination, it may in fact be that it wouldn't have been as likely had there been a timely disclosure of that matter, isn't it? I'm sorry, could you repeat that, Judge Smith? I don't understand how it could have been different. The time frame is immaterial here. I mean, he was still on direct when they learned about it, when they objected to it. They start their cross much later. Again, if they'd had it three days earlier, I don't know what else they could have done. But exactly what they did, call him a liar time and time again in closing and cross-examination, say, you just made this up. It wasn't there before. Let's talk about another piece of timing. You heard Mr. O'Reilly make the argument that under 16A1C2, they should have gotten these materials 30 days ahead of trial instead of three, or I think you guys said you gave it a week. But 30 versus three is, for sake of discussion, I guess an adequate differential, that they could have done a whole lot more had you not had an unduly cramped and unjustifiable view of that rule, particularly in light of Chalmers. So there's a lot in that. But let's start with the prejudice piece of it. They say they could have done a lot more. Why are they wrong? Well, it's their burden to show prejudice. And I think just sort of standing up here and saying, oh, our whole trial strategy would have been different is insufficient. Let me just say I think that's the fundamental problem here, which is they're asking an appellate court in the first instance to make a prejudice finding. I've pointed out several times in my briefing that they filed a 260-some page post-trial motion seeking reversal on pretty much every conceivable ground. This should have been presented to Judge Cooper, who could have said, first, if they had objected at trial when most of these things came in, and second, she could have said and helped this court decide whether or not any of these nondisclosures were, in fact, material to their defense. To ask the appellate court to make a determination on a chart of 200, you know, alleged violations is almost impossible. And I think what they're trying to do is sort of overwhelm the court. Then if you would speak to the other piece of that question I just asked, which is their interpretation of 16A1C2. Why is their view, which you call a novel one, even though Chalmers is on the books. It's evidently not novel. Why are they wrong? Well, let me just correct. What I called novel was their decision to break up both parts of the rule, the C1 from the C2. I thought that was a little bit unusual. Isn't that just exactly what Chalmers says? Chalmers says if we read this rule the way the government reads it, then C2 doesn't add anything to C1. That's at least the judge's view in Chalmers. So they're pressing the line, which has been taken in a reported decision. Why are they wrong about the rule? Yeah, and let me go directly to the merits of that then. We really think that this law of evidence really needs to make sense, and to me what really epitomizes it is if you have an individual who is in, let's say an employee at Atlantic States, and they see 20 different things but they are just a mere observer. We're not going to attribute any conduct to that person, but they've seen every bad thing that's happened there. Their position is, and our position is, that that's not discoverable. You've got a second person who sees one thing that we are going to attribute, or does one thing that we are going to attribute, and that is discoverable and we both agree on that. They say if those two separate people are the same person, then all of a sudden they get everything that the witness saw in addition to everything that the participant saw. And I just think at a fundamental level the rules of discovery need to make sense. They shouldn't turn on the arbitrariness of whether it's seen by two people or one person. It needs, what's discoverable for a defendant depends on what that person is seeing and whether or not it really is something attributable. One last question going to what Mr. Critchley argued, and that is this assertion that by declining to talk about recklessness, the court left the opportunity for the jury to be confused in a case where there were multiple mens rea levels in play. I would emphatically disagree with that, Your Honor. There's really no case. What he's asking, there's no case anywhere that I've found or that he's cited where a court has erred to define knowingly in general without reference to recklessly. What Judge Cooper said emphatically to them is I'm dividing the world into two parts. There's knowing and willful, and there's negligence no matter how severe. And I'm giving you negligence no matter how severe. There's no reason Mr. Critchley couldn't have stood in front of that jury and said, ladies and gentlemen, my client was negligent. He was grossly negligent. He was reckless. He was so bad. But Judge Cooper has told you several times that that's not enough. Knowing and willful. Now, she didn't say reckless. She didn't say, you know, gross negligence. But she said, you know, knowing and willful is absolutely required for every felony count. And for him to say that they were not free to make that argument, the government wasn't going to object. He pointed out we didn't object to reckless when it was in the instruction. The judge herself concluded that it's just going to confuse the jury. But it wasn't, you know, it's a pure choice of language issue. And the notion that a district court judge errs by defining knowingly without reference to recklessness when recklessness is not an element of the crime is that's a novel one for me, Your Honor, more so than the Chalmers point. And I think on the ‑‑ I don't know if you want me to address the mutually exclusive verdicts point or not. I think that's clear. I think Justice Alito or then-judge, now Justice Alito's opinion in Buol v. Vaughan is important here. The notion that you can have different mens reas, manslaughter, knowing and intentional, and that they're not mutually exclusive. It's hard to imagine how, if it really is a lesser included offense, finding on the greater means you can't find on the lesser. I think that's just common sense. If there are no additional questions. Thank you, Your Honors. Mr. Mormarco, thanks very much. Mr. O'Reilly. Thank you, Your Honor. If I may, it's going to be rapid. Number one, the court said specifically with regard to negligence. Negligence is a sliding scale. We, meaning the defendants, can stress that no matter how negligent a person may be, blah, blah, blah, blah, blah, that's according to the quote, but I don't want the word recklessness to be charged or described to the jury. What's next? That's what the judge said specifically to us and warned us. Do not dare go near that on your summation. The next part is, Mr. Mormarco got up, and the government would like you to believe that these things with Mr. Rush were done on the day before or two days before or three days before he testified? Not true. Record. Mr. Critchley's cross-examination. Others' cross-examinations. One month before this trial, he met at least five times. This is on October 27th at 05 on page 8, and you can take it from lines 15 to the end. He met with him in Trenton for hours, hours, five times before him, 30 days before the trial started. Does that mean because he met with him, does that mean that it came up? Trial prep, Judge. Trial prep. This is all he did. He met trial prep, went over his testimony. Yeah, but what I'm asking you is the implication, if it's not your direct statement, is that the government is just lying when they said it came up in the middle of trial, and your evidence for that is that they met with him and prepped him pre-trial. I'm not sure I follow the logic of saying because they prepped him pre-trial, that means it must have come out pre-trial. We asked him specifically, Judge. This was the cross-examination after these things came out, and they said it was only one day. And then we went at him and said, when was it? And he told us it was a month before five or six months. With regard to the prejudice, Judge, with regard to the breaks, the whole thing with that, they withheld from us Jim Yukner's statement in front of the grand jury, his testimony in front of the grand jury, where he said, I never fixed the breaks. Nobody ever instructed me to fix the breaks. Nobody ever touched the thing. I did exactly what Jeff Maury told me to do, leave it there, don't let it touch it until Osha gets here. That totally contradicts Mr. Shepard, totally contradicts his testimony, and what makes it worse, at the time of summation, Mr. Goldsmith got up, and he says to the jury, look, ladies and gentlemen, we have a handshake deal with Mr. Shepard. We trust him. He trusts us. That's vouching for a witness, and just vouching for your star witness, and that's impermissible. And that alone warrants an entreaty. Thank you. Mr. O'Reilly, thank you very much. Thanks to all counsel for very good arguments. We will take the case under advisement.